Henry's Louisiana Grill v. Allied Insurance Company of America Mr. Leonard, take your time, but whenever you are ready. Good morning, Your Honors. It's a pleasure to be here. May it please the Court, my name is Jim Leonard. I'm with Barnes and Thornburg in Atlanta, and I represent Henry's Louisiana Grill and Henry's Uptown, LLC, who I'll refer to collectively as Henry's. I would like to start, if you'll indulge me for 30 seconds or so, just tell you who my client is. Henry and Claudia Chandler, unfortunately, are not able to be here today. They had an emergency. Otherwise, they had otherwise planned to attend. They started out a local family business. It's a one-stop location, one restaurant in Ackworth, Georgia. They started it in 2000. They survived Y2K. They survived 9-11 and its fallout. They survived the 2008 recession. They survived Henry's liver cancer and liver transplant. They survived this pandemic. They bought insurance for all 22 of those years that they operated that restaurant. I would say there's basically two issues that this case comes down to, and that is the meaning of direct physical loss of or damage to property and who should make the decision as to what those words mean. That's really what I believe we're here about today. There's been a pretty universal view of what those words mean in courts around the country, hasn't there? There have been quite a few, obviously, COVID pandemic coverage cases decided, most of them in federal courts. There have been state court decisions as well. There have been a handful of federal courts who have either ruled in favor of the insurers or have deferred to the state courts to proceed. But certainly a majority of cases at this point, if we're counting those, have gone in favor of the insurers nationally. I'd point something out. I've practiced in Georgia a long time, and I see that Georgia is often in the minority on issues relating to insurance coverage and other matters. So, for example, late notice. Georgia is terrible for insurers on late notice, and they are in a very clear minority on that. The 13-colony exception on Lex Loci, that's not a minority. That is a single, stand-alone position that the Georgia Supreme Court has taken and consistently affirmed. My former colleagues have, I'll concede, taken a range of some I call quirky positions. But there's, in my experience, a reason for it, generally. Some difference in Georgia's law or the importance of the integration of the common law at a particular time into Georgia's law. There are various reasons. I've not seen, in your briefing or elsewhere, a reason that Georgia would interpret these terms any differently than anyone else, based on that state's case law, constitution, or history. Can you explain to me what I've missed? My view of it, our view of it, is that the position that's been taken in the Affleck v. Chubb case, with which you're very familiar, and the other cases around the country that are going in favor of the insurers, is that there is language being added to the policies. A policy says direct physical loss of or damage to property. It does not say direct physical loss of and physical structural alteration. It doesn't say that. And Georgia Supreme Court has been very clear for many years, you can't add language to the policy that would otherwise restrict coverage, and they've been very strict on that. But part of the rationale for these other courts, and I agree with everything Judge Grant has said so far, and my reading is the same, but part of the rationale is that not just that one isolated language that you're talking about, but in looking at the contract as a whole, including the period of restoration, it seems to suggest that the loss that we are talking about, and we all agree that loss is a broad word, applies to the physical, meaning the physical structure of the business, not loss of use, not change in use, but something happening to the property itself by use of the term repair, rebuild, et cetera, or new facility. That is consistent with Georgia law as I understand it, taking a holistic reading the whole thing together to understand what the words mean. And a lot of courts have used that exact language, that combination, to reach the conclusion contrary to yours and consistent with the district courts. Can you address that for me? Yes. So restore, replace. Repair. Repair, right? We can look at what those words mean in the dictionary. Restore, returning to normal function. What we had here was a direct physical loss of the dining room space in a restaurant, which is at Henry's. I lived a block from Henry's for ten years. You know, it is a fun place to be. Fun, not in the marijuana sense from earlier, but it is a fun, loud place to be. It's the space where this restaurant lives. Counsel, what I want to focus on is Henry's didn't lose the dining room. It lost the use of the dining room. But the dining room was there the same way it was there before the order as it was after the order. But he had the direct physical loss of that space. The use of that space, yes. And, yes, there is an exclusion that says loss of use, loss of market, and so forth. That exclusion goes, and there's cases all around the country, not in Georgia, but that goes to secondary, you know, follow-on type losses. So here, if you eliminate the idea of the loss of use, the direct physical loss of use of that restaurant space, the dining room space, you've completely eliminated business interruption coverage. The problem, though, was that it was still there, right? I mean, the building was still there. Nothing was different about the building, right? Well, in a sense it was because the building has all these seats that are packed next to each other. One day on March 14th, that building's fine to have all those people in it. On March 18th, it was not the same building. You could not put all of those people in there. Part of this assumes, though, that the order, and this is an issue that's brought up by your opposing counsel in the district court, that the order was the cause of that. So we're assuming that the order prohibited your client, the restaurant, from letting people in. But I've read the order backwards and forwards, and I don't see anywhere where it prohibits, discourages, does anything to stop people from using the restaurant. Now, let me be clear. I'll say what the district court did. The restaurant acted commendably here, as many other businesses did. But that's separate and apart from whether coverage is appropriate. Again, I would say it's the loss of use that is covered, direct physical loss of use. And so I would want to touch on, just briefly, the issue of certification. And we can do that. This is a case that, obviously, the pandemic, the change in that facility from one day to the next is unprecedented. And to claim that we're not living in unusual times over the last two years is just simply not true. The Supreme Court of Georgia has never addressed coverage for anything like this before. It should be certified to them. There is a clear process for that, and we obviously have moved the district court and this court to do the same. Thank you. Thank you. I think we'll hear from your amicus now. Mr. Is it? Gillette. Mr. Gillette. You have four minutes. Thank you, Your Honor, and may it please the court. Gabriel Gillette from Jenner and Block, representing the amicus in this case, the National Restaurant Association's Restaurant Law Center. I want to start where my colleague left off, which is on the certification point. And I think something that's really changed in this case over the time that it's been pending before this court is that the state courts are now getting engaged at the highest levels. Whereas when we were briefing this case, I grant the court that you look in the briefing, it is by and large federal district court cases that are driving the perceived majority rule here. But now the state Supreme Courts are getting involved. I count 11 states' Supreme Courts where a case is pending right now. There are two more where applications are pending. There are four more where I expect applications for leave to appeal to be pending shortly. There are two states that have already issued decisions. And I think that changes the dynamic here because what it means is that this court can either make the eerie prediction. It can say this is what I think Georgia law would be. And I understand, Your Honor, Judge Grant, you say, you know, I haven't seen a reason Georgia would do things differently. But now you can actually sit back and wait. You could certify the case to just let Georgia decide. We've been really careful to not do that. In other words, what we've said is we're not just going to certify just because. Because if we did, we have tons of diversity cases. And believe me, we could keep the state courts busy if we went that route. We do it, and I've tried to look at all of our diversity cases. We've done it where there seems to be conflicting opinions, where there's no precedent at all, where the states are hopelessly deadlocked on something and there's no majority rule. Those are the instances where we've done it. But here, we seem to have some intermediate case law. We have what seems to be a pretty darn good consensus around the country. Not uniform, but pretty heavy consensus on what it is. And there doesn't appear to be any sort of conflict that's prohibiting us from making the eerie call. I don't see why this would not fit into situations where we do our level best and make our guess, and at some point the state court will tell us whether we're right or wrong on it. Sure. I want to fight the premise a little bit, Your Honor, because I think you can't premise, you can't say there's a majority rule based on looking at district courts, federal district courts predicting state law at this point. There is no majority rule in the states because the state supreme courts are the final arbiter of these cases. And let's just take the two state supreme court decisions we have so far. They're different. I'll grant you they both come out against the policyholder, but they do so in very different ways. Except that, and it's certainly not binding here, but our S.A. opinion from the other day, that seemed to suggest there was a majority rule, and it seemed to rely on majority view, and it seemed to rely on federal cases from around the country. The decision says there's a majority rule, and I think that's incorrect because— We're bound by that, though. You're not bound by—I mean, the statement that there's a majority rule as to Florida law, I guess you could say, is fine. I recognize there is intermediate appellate, a recent intermediate appellate decision in Florida that maybe changes the analysis here, but I want to stop for a minute because Massachusetts issued its decision and Iowa issued its decision, and they're different. And there are policyholders in Iowa that have claims that could be valid that are not valid in Massachusetts anymore. And there are federal decisions from the Eighth Circuit, from the district courts in the Eighth Circuit, that cut off policyholder rights that Iowa now says are valid, or at least has a chance to plead the claim. And I guess I want to move on with the short amount of time I have left to just remind the Court that there are many theories out there. There are many factual allegations. There is different policy language. And so if the Court is going to proceed and make a decision here, I think it needs to be cognizant of that because however this case comes out, there are other policyholders that, for example, have pled what the physical changes are to their property that were caused by the virus or caused by the orders. There are cases out there that have different policy language, both parts of the insuring agreement and exclusions. And so I just think the Court needs to be careful that whatever it decides to do, ideally I would say certify. If not, if you're going to go forward and issue the decision, be careful that it's limited to this case and that it allows others to move forward if, in fact, they can state a claim. Thank you. Thank you. Mr. Saverin. Thank you, Your Honor. Philip Saverin for Allied. I'd like to start with pointing out, as Judge Luck noted, that there's nothing in this executive order that required the businesses to do anything at all. Can we just decide on that basis and not reach the language issue? Yes. Was there not a later order in Georgia that did actually close restaurants for a little while? There was an order, I believe a month later, Your Honor, that if I – and I didn't look at it right before it prepared, but I believe it prohibited in-dining, in-restaurant dining, but allowed still the use of the kitchen and takeout and delivery and things of that sort. We pointed that out very clearly to Judge Thrash in the district court and even noted that they were – the complaint, paragraph 13 in particular, says that they decided to close because of this executive order. We pointed out in the briefing, and there were quite a few briefs on the motion to dismiss going back and forth, we pointed out that subsequent order and that the complaint was not relying on that. The Henrys, the appellant here, certainly had the ability, if they wanted to, to amend the complaint. We had not answered it. They could have done it without leave of court to rely on that executive order. But looking at the complaint, they were relying just on this executive order that does not require Henrys or any businesses to do anything. It is simply the governor saying that there are protocols authorizing different agencies to establish protocols. So on that basis alone, we don't have a necessary suspension of operations, nor do we have the directness that the Aflac case requires. In other words, counsel, I just want to be clear what you're saying. The claim before us is only a business income request and a civil authority request as a result of executive order number 03.14.20.01, correct? Yes, Your Honor, and that is found in the record of document 7-1, by the way. So, yes, I think that that in and of itself disposes of the case, and I also think that this would not be a proper case. If there is a proper case to certify it, this would not be that case. I would also point out that this Court has already decided the Gilreath case, which was based on both of those orders. That's not actually in the language of this Court's appellate decision, but I did pull up on PACER the complaint, because I was curious about that, and the Gilreath case, which found that there's no coverage under this language. In that case, it relied on both orders. So if there was any case that supported even anything in terms of applying the language of the policy, it would be an order that required the closure, because then we might have a necessary suspension of operations. Well, why would that even – I'm having trouble, frankly, seeing why you would argue that that would be any different. If the argument is that there's no physical loss, why does that make a difference? That was my next point. I was going to say that you might have a necessary suspension of operations, but it would not be due to a direct physical loss. And on that, so even with the second order that did limit the in-person dining, you still would not have the direct physical loss. The argument is interesting in a way that Henry's makes, because they're saying that, well, maybe the Supreme Court of Georgia will rule differently, but the standard is either under the certification rules or the rules about – under the Erie Doctrine, this Court's rules under the Erie Doctrine. The rules under the Erie Doctrine are very clear that the federal court is bound by the intermediate appellate court decisions absent indication, clear indication, from the Supreme Court of Georgia that it would rule otherwise. There is nothing at all that Henry's has presented about how the Supreme Court of Georgia would rule that's different from the Affleck case. And one of their main points that they've made is, well, there's some case, there's some policies that say direct physical loss or damage to property, and there are others that say direct physical loss of or damage to property. And throughout the briefs, you will see the word of in italics. And they're saying, well, Affleck got it wrong is what they're saying, because Affleck says very clearly that the words loss of means the same thing as physical loss or damage. And what that means is an external event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so. Affleck stands against them. What does loss mean separate from damage? Loss means either theft or permanent loss. That's what it means. That's what the case law interprets it as. Except that business income, that wouldn't seem to make sense under a business income claim, because by definition it's temporary. In other words, the whole concept is it has a starting point and an ending point. Right. So it can't be a permanent loss. It could be a permanent loss because the suspension of the period of restoration is repair, rebuild, or replace. It's not restore. That was the word that was used. Right. Or resume at new location. Right. So it's one of those two. Either you have property damage that you have to repair, rebuild, or replace in order to be operational again, or you have to open a whole new location. For example, a hurricane comes in and just gets it down to the foundation. I guess my question is wouldn't that, while it could be permanent loss, it also seems to indicate temporary loss, correct? Yes, physical. Temporary physical loss. How is that different than damage? How is that different than damage? Yeah. Because you can have a physical loss of the property. I mean, I'm not sure I'm following the question. I'm sorry. So let me be more clear about it, and I apologize. I'm sure that's the way I'm asking it. Your opposing counsel throughout its brief says, and it seems to me its primary argument is, loss and damage have to mean something different because they are two different words, and under Georgia law, at least primarily or usually, I forget exactly how the statute says that, but we generally presume that different words are given different meanings, and if you read them together as AFLAC did, you seem to be reading out one of those words. That's how I understand a large part of the opposing counsel's argument. Okay. I understand now. So now my question to you. Okay. What does damage mean? Damage means that it damages it so that there is a physical damage to it. How is that separate from a temporary loss, which requires repair, replacement? No, I see the loss as being the period of restoration would be resuming at a new location. Well, that's one aspect of it, but it also seems to cover repair, replace. I forget the third one. I apologize, but there's a third one. Repair, rebuild, or replace? Rebuild. Rebuild. I think the point is well taken. I would say that the district court reasoned through that in terms of the loss being the total loss of the property and damage being the temporary loss. And I'll also point out that the Commodore case that we cited to the court, this is the intermediate court from the Third District Court of Appeals in Florida, just decided last May, I mean last week. It says the terms are not redundant. Loss can include theft or complete ruin while damage is considered a lesser harm to the property. In other words, loss of and damage to are degrees of harm, which in all events must be physical in order for there to be covered. In other words, it's a greater lesser issue. The damage is the lesser, loss is the greater of the two. Yes. And that's the only way to harmonize the entire contract and the entire policy with the period of restoration and the way that AFLAC has interpreted the direct physical modifies both loss and damage and then how it describes it. In fact, AFLAC says, if I can pull it up again, says that the either unsatisfactory for future use, which would be permanent loss, or requiring that repairs be made to make it so. If I can go back. Yeah. If I can go back for a second. I just want to clarify this point because I think it's important. So the allegation is that they closed immediately after the March 14th order, correct? Yes. In other words, they can't make a claim for the later order because their loss claim is for the period before that order existed, right? Well, I think. At least based on what we have right now. Yes. I mean, possibly they could have amended the complaint to say that the continuation. I'm talking about what we have right in front of us today. Yes, exactly. So could we decide without interpreting the language, sort of the key language that we're all talking about here, direct physical damage or loss or loss of damage to language that seems to be a key here. Could we simply say that there was no necessary prohibition to operating and decided on that without reaching the issue of the language or needing to certify or anything like that? Yes, because the triggering language is necessary suspension of operations and caused by the direct physical loss. So that's the essential element, so to speak, of the grant of the business income loss. So if we were to determine based on the allegations that the suspension wasn't necessary based on the executive order from March 14th, the only one alleged here, then we wouldn't need to reach the other issue in this case. Correct, and that's our first position, our primary one. And that would leave open the possibility that the Georgia Supreme Court, if they filed in state court and it wasn't removed, could decide the more crucial issue. Yes, and Mr. Leonard did file a notice saying that he just recently filed one in state court that on the issue of direct physical loss, I looked at the docket and they have extensions to answer that until sometime, I think in May or June, so that's going to wind its way through at some point. But I'm still having trouble why the one approach should be a preference over the other because in either instance, we're interpreting the language of the insurance contract, right? Yes. So why wouldn't it be your preference to decide it in a way that would cover more cases? Why wouldn't you argue, now maybe we wouldn't do it, but why wouldn't you argue that we would want to decide it in a way that would affect more cases? Well. Given that both of them are an interpretation of the language in the insurance contract, one isn't going further than the other, really. My client's preference would be that the court rely on both grounds. In other words, say that it's not necessary suspension, but even if it were, it does not meet the triggering language for a direct physical loss. So I would say the preference is both. But, I mean, in being principled about it, I don't think you get to the second one unless you have the first one. So it's, I mean, we're arguing both. And we're also, I mean, before my time goes up, I want to mention that we're also relying on the virus exclusion, which some of these cases don't have. This policy does have. The language is directly or indirectly from a virus. And Georgia applies these exclusions broadly, or I should say not broadly, but literally. And, in fact, there's the Hilco case from the Northern District of Georgia that went to the virus exclusion and didn't reach these other questions. And that was not raised by the appellant until the reply brief. But their point is, their response to that, as I understand it, other than waiver, is that they didn't close because of the virus. In fact, they specifically plead around that. They closed because of the order. No, I understand, but the order was because of the virus. And so because, so it's when it's directly or indirectly, and the language has the non-concurrent causation, so that it doesn't matter what sequence it's in. But the order was because of the virus. And, therefore, it's directly or indirectly from the virus. Given that the pandemic was, I think, pretty unexpected for most people, what's the ordinary operation of this virus clause? Does it say if there's a norovirus outbreak at the restaurant or something like that? No, it just says arising from a virus or caused by a virus. Right, but why do you think that provision is in there? Why is it in there? Because viruses can cause a lot of problems, and insurance companies are trying to do their level best to do their underwriting so that they— Why do you think that that clause addresses? You think? I think it means anything having to do—any harm caused by a virus. And not just a virus, it's also bacteria. So they're really looking at any kind of living organisms, I would speculate. I think what Judge Grant's asking, and I'm a little confused by it also, is if the whole point is this covers physical damage, in other words, the building has to be, how does a virus play into that ever at all? What's the factual—play that out for me, how— Not just generally, viruses are bad, we want to protect, but what, like, factually speaking, what would this ordinarily targeting— That's a very good question. How does the roof fall because of the flu? Yeah, that's a very good question. The only way I can—I've thought about that. The only way I can answer that, I think—the only way I can think to answer that is that the exclusion is not contemplating this particular situation, but the exclusion is there because viruses and bacteria can cause lots of issues, and so it's an exclusion from coverage. But as far as—I don't know that it—I'm sorry. Does the virus exclusion apply if the bacteria results from, let's say, after a cause that is covered, like a flood? If—the standard in Georgia is very clear. It's but for causation. But for the virus, would this loss have happened? And so it's— So even if there's a flood, the virus excludes any damages caused— the virus exclusion excludes any damage caused by bacteria that results from a flood? It would apply to any damage that would not have occurred but for the bacteria. And we see that in some of the hurricane cases where you have wind and rain, water, and they try to differentiate between the two. There's not necessarily a simple way to do that. Thank you. I think your time is up. Time is up. I'll rely on the briefs in terms of this response to the certification issue. I appreciate your argument. Mr. Leonard, you've got three minutes left. Thank you, Your Honors. Touching the virus exclusion quickly, we did not get to do discovery on that because, of course, we're thrown out of the motion-to-dismiss phase. We believe that discovery would have revealed that that virus exclusion was filed by Nationwide and the entire insurance industry to try— this is what was told to the insurance departments— was to try to limit claims by third parties after the last sort of virus came through, but it wasn't anything like the pandemic. And as Your Honor related to earlier, what we had here with the novel coronavirus-19 was absolutely unprecedented. There was no meeting of the minds between Henry's and Nationwide or, for that matter, any other insured and insurer to provide coverage for something like this. Isn't that a problem for you, though? No, I don't think so. Because I think you have to look at the language in the policy then and really focus on what the language of the policy says and not add words to it like structural change and loss is greater than damage. Policy doesn't say that. It simply doesn't say that. And this is where I think the Georgia Supreme Court would be most helpful and instructive in resolving that. I will quote from the Whiteside v. Geicondemnity case from this court, 977, Feb. 3, 1014. Your Honor, Judge Grant wrote, in certifying questions to the Georgia Supreme Court, though we have our own guesses about the answers to these questions, we do not think it appropriate to substitute our own intuition for the views of the Georgia Supreme Court in deciding these novel issues of state law, at least one of which has significant consequences for Georgia's public policy on motor vehicle insurance, which obviously it did. And the questions came back from the Georgia Supreme Court, probably not the way you're anticipating them to come back, I'm just guessing there. But that's why we have a federal system. And I got up this morning and I checked and we're still, thank God, a constitutional republic with joint systems of government and that flag, that beautiful flag behind you says equal justice under law. And the way to really accomplish that in this case is let the Georgia Supreme Court make Georgia law and let's not have two separate lines of coverage authority, one federal and one state. It would be so simple to refer this case to the Georgia Supreme Court. Thank you. Thank you. Thank you. We appreciate the arguments today and this court will be in recess until tomorrow at 9 a.m. All rise. Thank you.